UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

United States of America

v.

Julio Rodriguez and Laurence Savedoff,

Defendants.

**Report and Recommendation**
16-CR-41G

## I.    INTRODUCTION

Defendants Julio Rodriguez ("Rodriguez") and Laurence Savedoff ("Savedoff") allegedly helped sell several properties in Bronx, New York in 2008 and 2009. The sales by themselves would have been uneventful. The problem is that Rodriguez and Savedoff allegedly played roles in a conspiracy to dupe the Federal Housing Administration into insuring mortgage loans for these properties, using loan packages that contained fabricated information about purchasers' income and employment. Once federally insured, the loans allegedly were sold to M&T Bank, Suntrust Bank, Bank of America, N.A., JPMorgan Chase Bank, N.A., Metlife Home Loans, LLC, and Citibank. Rodriguez and Savedoff now stand accused of multiple counts of mail and wire fraud under 18 U.S.C. §§ 1341, 1343, 1344, and 1349.

Although Rodriguez and Savedoff do not dispute that the Government's allegations reach this District, they have filed motions to transfer the case as against them to the United States District Court for the Southern District of New York, under Rule 21(b) of the Federal Rules of Criminal Procedure. (Dkt. Nos. 135, 154 / 169, hereafter [135, 154 / 169].) In short, Rodriguez and Savedoff argue that the bulk of the case as against them rests in the greater New York City

area, including the actions that they allegedly took and the witnesses who would testify for or against them. Rodriguez and Savedoff note further that they are from the New York City area, as are their counsel and the small businesses that they run. A transfer, in their view, would minimize hardship and serve the interests of justice. The Government opposes transfer, given that the investigation originated in this District, some witnesses at trial would be from this District, and at least one victim bank—M&T Bank—also would be from this District.

This case was referred to this Court under 28 U.S.C § 636(b). [27.] The Court heard oral argument on January 10, 2018 [159] and allowed additional briefing through February 9, 2018 [163]. For the reasons below, the Court respectfully recommends[1] granting the motions and transferring the case as against Rodriguez and Savedoff to the United States District Court for the Southern District of New York.

## II. BACKGROUND

This case concerns allegations that Rodriguez and Savedoff, along with co-defendants Gregory Gibbons and Tina Brown,[2] conspired to defraud banks by selling them fraudulently obtained mortgage loans. The following excerpt from the indictment, filed on April 13, 2016, captures the essence of how the fraud conspiracy allegedly unfolded:

> The defendants, RODRIGUEZ, GIBBONS, SAVEDOFF, and BROWN, made, and caused to be made, false statements in loan applications to TFS for multiple loans for the purchase of real property which were insured by the FHA.

---

[1] The Second Circuit appears not to have addressed whether a motion to transfer under Rule 21(b) qualifies as a dispositive motion. Out of an abundance of caution, and for the reasons that the Court expressed in *United States v. Joseph*, No. 12-CR-363A, 2013 WL 5223956, at *2 (W.D.N.Y. Sept. 16, 2013), the Court has prepared recommendations for Chief Judge Geraci as if the motions were dispositive.
[2] Defendants Gibbons and Brown have entered guilty pleas and await sentencing as of this writing.

2

> These loans were initially funded by TFS and then sold to federally insured financial institutions.
>
> In these transactions, the defendants, RODRIGUEZ, GIBBONS, SAVEDOFF, and BROWN, assisted individuals with the purchase of properties and fraudulently qualified them for FHA insured mortgage loans through false applications and supporting documentation submitted to TFS.
>
> To induce TFS to make the mortgage loans, the defendants, RODRIGUEZ, GIBBONS, SAVEDOFF, and BROWN, caused loan packages to be prepared and submitted that contained false and fraudulent statements, representations, pretenses and promises, and that omitted and concealed material facts. Loan packages submitted during the course of the scheme variously misrepresented and misstated:
>
> > a. the purchasers' income and/or assets;
> >
> > b. the purchasers' place of employment;
> >
> > c. the existence and source of down payment funds to be provided at losing by the purchasers;
> >
> > d. the occupancy of the premises;
> >
> > e. the ownership of the premises; and
> >
> > f. otherwise contained false or forged documents.
>
> * * * *
>
> As a result of the false and fraudulent statements and representations made by the defendants, and others as directed by the defendants, in the transactions described in detail below, loans secured by real estate were originated by TFS, insured by FHA and sold to M&T, Suntrust Bank, Bank of America, N.A., JPMorgan Chase Bank, N.A., Metlife Home Loans, LLC, and Citibank.

[1 at 6-7, 9.] Rodriguez and Savedoff were arraigned on April 18, 2016. Up to this point, and without repeating information already in the docket, the case has been working its way through certain discovery issues (mentioned briefly below) as a prelude to the filing of omnibus defense motions.

3

On November 22 and December 27, 2017, and January 25, 2018, Rodriguez and Savedoff filed the pending motions to transfer. Savedoff summarizes his motion as follows:

> [T]he "center of gravity" of this entire action is the New York City area. It is where all of Mr. Savedoff's alleged conduct occurred, it is the location of the properties at issue, it is where the transactions at issue closed, it is where (or very near where) the purchasers reside, and it is the center of the alleged criminal scheme. Furthermore, all of Mr. Savedoff's likely witnesses and character witnesses (and likely most of the government's witnesses pertaining to him) live and work in the New York City area, as does Mr. Savedoff himself and his counsel.
>
> Having to face trial in the Western District will be devastating to Mr. Savedoff—he will be unable to operate and continue his solo law practice during trial and, he will have to go it alone, without his wife being able to attend trial, all while he will be unable to help take care of his family during the extended trial. Trial in Buffalo will be exponentially more expensive for Mr. Savedoff than trial in the Southern District.

[135-2 at 6–7.] Rodriguez endorses Savedoff's assessment of the substantive factors affecting transfer and then adds his personal perspective:

> The Court appointed undersigned counsel, located in Manhattan in the Southern District of New York (SDNY), because Mr. Rodriguez could not afford the costs of travel to Buffalo, in the Western District of New York (WDNY), to consult with his previous appointed counsel and to review the voluminous discovery in this case. In addition, substitution of counsel eliminated complications that would result from Mr. Rodriguez's absence from the Bronx, insofar as it would impact childcare obligations to his 7-year-old son. Due to Mr. Rodriguez's indigence, the costs of travel, lodging, and sustenance for the duration of trial would require Criminal Justice Act funds, in addition to CJA funds for same costs for appointed counsel.

[169 at 2.] The core of the Government's response is a recitation of the ties that this case has to this District:

> The investigation led by the United States Attorney's Office in this District, arises out of a complaint initially brought to investigators in the Western District of New. The investigation was conducted by law enforcement agents assigned to the HUD Office of Inspector General in the Western District of New York and the

4

> Northern District of Ohio, the United States Postal Inspection Service in the Western District of New York, and the Federal Bureau of Investigation in the Western District of New York. The investigation involved numerous interviews, voluminous document review, and financial analyses.
>
> Importantly, the title company to which the defendant mailed loan documents for approval is located in the Western District of New York. Additionally, one of the victim financial institutions was M&T Bank, which is located in the Western District of New York, and the defendant caused wires to be sent by M&T Bank related to the charged transactions. Finally, wires sent to the defendant's escrow account that were essential to closing the transactions charged in the indictment, were sent through Capital Bank via Elmira, New York, which is also located in the Western District of New York.

[147 at 3.] The Government addresses Rodriguez's personal circumstances as follows:

> The defendant states that he has childcare obligations for his 7 year old son who resides with him. However, he does not provide any facts that describe the complete nature and extent of those obligations or whether there are other family members, such as the child's mother or other relatives that may be available to temporarily assist him during a trial. Rodriguez only states that he is responsible for taking his young son to and from school and that he cannot afford the costs of childcare. This simple assertion is inadequate to provide a basis for the court to find that he cannot temporarily meet those childcare obligations during a trial. Rodriguez further asserts that he has responsibilities to his 85-year-old mother who does not reside with him but has dementia and cardiac issues. He does not indicate what those responsibilities entail or whether or not another family member can temporarily assist with them. Nor does he explain his responsibilities to his sister who does not reside with him but suffers from schizophrenia.

[172 at 19.]

## III. DISCUSSION

### A. *Motions to Transfer Generally*

"Except as otherwise expressly provided by enactment of Congress, any offense against the United States begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun,

5

continued, or completed." 18 U.S.C. § 3237(a); *see also* U.S. Const. art. III, § 2, cl. 3 ("The Trial of all Crimes . . . shall be held in the State where the said Crimes shall have been committed . . . ."); *id.* amend. VI ("In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law . . . ."); Fed. R. Crim P. 18 ("Unless a statute or these rules permit otherwise, the government must prosecute an offense in a district where the offense was committed."). No one disputes that some aspect of the crimes alleged here occurred in this District. The Government has done nothing wrong bringing this case in this District; it *could* be brought here. A major part of the crimes alleged also occurred in the Southern District of New York, however, and "[u]pon the defendant's motion, the court may transfer the proceeding, or one or more counts, against that defendant to another district for the convenience of the parties, any victim, and the witnesses, and in the interest of justice." Fed. R. Crim. P. 21(b). "As the language of the Rule suggests, district-court calls on the necessity of transfer are granted a healthy measure of appellate-court respect . . . . We therefore review [a] District Court's venue-transfer decision only for compliance with the Constitution." *Skilling v. United States*, 561 U.S. 358, 378 n.11 (2010).

Countless courts within this Circuit and across the country have cited a list of 10 factors affecting transfer that appeared in a Supreme Court case over 50 years ago: "(1) location of corporate defendant; (2) location of possible witnesses; (3) location of events likely to be in issue; (4) location of documents and records likely to be involved; (5) disruption of defendant's business unless the case is transferred; (6) expense to the parties; (7) location of counsel; (8) relative

accessibility of place of trial; (9) docket condition of each district or division involved; and (10) any other special elements which might affect the transfer." *Platt v. Minnesota Min. & Mfg. Co.*, 376 U.S. 240, 243–44 (1964) (internal quotation marks omitted). Interestingly, though, the Supreme Court neither wrote that list itself nor explicitly endorsed it. The Court of Appeals wrote the list, and "[i]t appears that both parties and the Court of Appeals agree[d] that the first nine factors enumerated were appropriate." *Id.* at 244. The original *Platt* factors, then, were essentially a stipulation at the Supreme Court level. The Supreme Court in *Platt* had no further comment on what should be considered under Rule 21(b) before proceeding to its limited holding that "the Court of Appeals undertook a de novo examination of the record and itself exercised the discretionary function which the rule commits to the trial judge. This the court should not have done since the writ [of mandamus to order a transfer] cannot be used to actually control the decision of the trial court." *Id.* at 245 (internal quotation marks and citation omitted).

Consequently, the *Platt* factors provide only non-exhaustive, advisory guidance. *See United States v. Aronoff*, 463 F. Supp. 454, 458 (S.D.N.Y. 1978) ("Although the Court did not expressly approve them, these criteria appear to be generally applicable, and have been employed in many cases after Platt.") (citations omitted); *see also United States v. Cashin*, 281 F.2d 669, 675 (2d Cir. 1960) ("[T]he Supreme Court has declared that venue statutes should, whenever possible, be construed so to permit trial at the residence of the defendant. The position taken by the government in this case is squarely contrary to this rule of construction, for it would permit the government to select the place of trial to suit its sole convenience simply by alleging [offenses] only at places where it wished the trial to be held.") (citation omitted). The factors certainly are time-

tested and widespread, and they are helpful to the extent that they put in one place all the major issues that a district court would consider anyway when assessing a request for transfer. The factors, however, should not carry too much weight beyond that basic helpfulness. As long as courts explain why they are transferring, or not transferring, their cases, they do not have to recite every *Platt* factor. *Cf. United States v. Benjamin*, 623 F. Supp. 1204, 1212 (D.D.C. 1985) ("The so-called *Platt* factors may be considered individually, although judgment ultimately rests upon an overview."). Consideration of the *Platt* factors also should not turn into a box score or formula, and courts should not allow them to morph into any "general rule":

> The beneficent purposes of Rule 21(b) will be thwarted, also, if it is supposed that there is a "general rule that a criminal prosecution should be retained in the original district." There should be no general rule whatever on the subject, although it is proper to require the defendant, as the moving party, to carry the burden of showing why a transfer would serve the purposes specified in the rule. Instead of applying a supposed general rule, the court should examine all the circumstances of the particular case and determine what place of trial will best serve convenience and the interest of justice in that case.

2 Charles Alan Wright et al., Fed. Prac. & Proc. Crim. § 345 (4th ed. and Supp. 2018) (internal quotation marks and citations omitted). Ultimately, "[d]isposition of a Rule 21(b) motion is vested in the sound discretion of the district court . . . . No one of these [*Platt*] considerations is dispositive, and it remains for the court to try to strike a balance and determine which factors are of greatest importance." *United States v. Maldonado-Rivera*, 922 F.2d 934, 966 (2d Cir. 1990) (internal quotation and editorial marks and citations omitted); *see also Matter of Balsimo*, 68 F.3d 185, 187 (7th Cir. 1995) ("Nothing in Rule 21(b) or in the cases interpreting it place on the defendant seeking a change of venue the burden of establishing 'truly compelling circumstances'

8

for such a change. It is enough if, all relevant things considered, the case would be better off transferred to another district.") (citing *Maldonado-Rivera*; other citations omitted).

### B. Propriety of Transfer for Savedoff

With the Rule 21(b) standard in mind, several considerations weigh in favor of transfer for Savedoff. The alleged fraud had an impact in this District, and the far-reaching effect of criminal activity is not insignificant. "[Savedoff] and the other defendants chose to engage in fraudulent schemes that relied upon the national mortgage market and activities and entities that were not confined to the Southern District of New York." [147 at 11.] Nonetheless, everything or nearly everything that Savedoff allegedly did in this case took place in his office building:

> Defendant SAVEDOFF used and directed his assistant, an individual known to the Grand Jury but not indicted herein, to handle aspects of real estate transactions involving mortgage loans originated by TFS and EPIX which are the subject of this Indictment, including signing defendant SAVEDOFF's signature on documents and sending wires and deliveries, all at defendant SAVEDOFF's direction.
>
> Co-conspirator 1, an individual known to the Grand Jury but not indicted herein, was a realtor licensed in the State of New York. Co-conspirator 1 maintained an office in defendant SAVEDOFF's building and acted as the real estate agent and as the seller in real estate transactions involving mortgage loans originated by TFS and EPIX that are the subject of this Indictment.

[1 at 5.] The Government is not wrong when it points out that

> the title company to which the defendant mailed loan documents for approval is located in the Western District of New York. Additionally, one of the victim financial institutions was M&T Bank, which is located in the Western District of New York, and the defendant caused wires to be sent by M&T Bank related to the charged transactions. Finally, wires sent to the defendant's escrow account that were essential to closing the transactions charged in the indictment, were sent through Capital Bank via Elmira, New York, which is also located in the Western District of New York.

9

[147 at 3.] Nonetheless, the Government's assertion neither contradicts nor outweighs Savedoff's assertion that the Southern District of New York

> is where all of Mr. Savedoff's alleged conduct occurred, it is the location of the properties at issue, it is where the transactions at issue closed, it is where (or very near where) the purchasers reside, and it is the center of the alleged criminal scheme. Furthermore, all of Mr. Savedoff's likely witnesses and character witnesses (and likely most of the government's witnesses pertaining to him) live and work in the New York City area, as does Mr. Savedoff himself and his counsel.

[135-2 at 6.] *See United States v. Coplan*, 703 F.3d 46, 80 (2d Cir. 2012) ("On occasion, we have supplemented our venue inquiry with a 'substantial contacts' test that takes into account a number of factors—the site of the defendant's acts, the elements and nature of the crime, the locus of the effect of the criminal conduct, and the suitability of each district for accurate factfinding.") (internal quotation marks and citation omitted). These circumstances distinguish one of the cases that the Government has cited. *See United States v. Wilson*, No. 01 CR. 53 (DLC), 2001 WL 798018, at *3 (S.D.N.Y. July 13, 2001) ("In sum, the only factor that argues for transfer is the location of the defendants and the personal impact on the two defendants and their families of conducting the trial in New York."). Another case is distinguished based on timing; Savedoff is presenting the circumstances of this case when no omnibus pretrial motions have been filed and no trial date has been set. *Cf. United States v. Spy Factory, Inc.*, 951 F. Supp. 450, 453 (S.D.N.Y. 1997) (denying a motion to transfer in part because it was filed "less than four months before the scheduled trial date"). In fact, to the extent that the Government attacks Savedoff's arguments about witnesses on the basis that he "fails to provide specific examples of witnesses' testimony and their inability to testify because of the location of trial" [147 at 10], there is some irony in the

10

simultaneous concession that "[b]ecause the posture of this case is well before trial in that all pretrial motions have not yet been filed, the government does not have a final witness list." [147 at 9–10.]

Expense is another factor to consider. Savedoff's principal trial counsel is in the Southern District of New York. Savedoff has represented that he can go to trial without his local counsel in Buffalo but cannot go to trial without his principal counsel. Assuming that an eventual trial in this case would last at least a few weeks, a transfer to the Southern District of New York would spare Savedoff the money needed for him and his counsel to set up camp in Buffalo for several weeks during trial, notwithstanding the Government's offer to let him "fully focus" here. [147 at 14.] *Cf. Benjamin*, 623 F. Supp. at 1212–13 ("In any federal district, the government lawyers have a built-in office, complete with local logistical support from parallel local staffs of the U.S. Attorney, IRS and the FBI. Each of these organizations has established telephone and telecopying access to its national office in Washington, D.C., with back-up and supervisory personnel easily available. The Justice Department is, or should be, staffed, so that if one prosecuting team is away from Washington, supervisors and other lawyers can carry on for them in any other matters for which they are responsible. In contrast, five California lawyers and one Arizona lawyer defending California clients in Washington, D.C., must establish their own local base or move in with local counsel. There is no indication that any of them belongs to a large firm affording a back-up base which could match that available to the government."). Additionally, as the Court noted above, omnibus pretrial motions have not yet been filed. *Cf. United States v. Jones*, No. 7:16-CR-30026, 2017 WL 4020875, at *4 (W.D. Va. Sept. 4, 2017) (denying transfer where, *inter alia*, "[t]he court

has held multiple pretrial hearings, decided dozens of motions, and is intimately familiar with this case. More than two hundred jurors have been summonsed, and the court has cleared its calendar for a five week trial. The parties have had many months to prepare, and by evidence of the fervor of their recent motions practice, they have been doing so actively."). Depending on the relief sought, hearings might be necessary that again would require spending a significant amount of time in this District for preparation. In contrast, the Government has admitted that some of its investigative materials and likely trial evidence originated neither in this District nor in the Southern District of New York. At least some portion of the Government's trial preparation costs thus will not change no matter where Savedoff's trial occurs. And in any event, outside of extreme or unusual circumstances, convenience and cost savings to the Government should not outweigh properly considered burdens on a defendant who is, after all, presumed innocent. *See United States v. Morris*, 176 F. Supp. 2d 668, 673 (N.D. Tex. 2001).

As for personal and professional impact, Savedoff is a solo practitioner in the Southern District of New York who handles all of the business aspects of his law practice. That practice would face significant disruption if Savedoff had to travel to this District for trial or lengthy hearings; considering the complex nature of the allegations and the likely voluminous nature of discovery, several weeks again is a reasonable estimate for the duration of an eventual trial. *Cf. United States v. Valdes*, No. 05-CR-156 (KMK), 2006 WL 738403, at *7 (S.D.N.Y. Mar. 21, 2006) (granting transfer to the Southern District of Florida; "The Government is correct in noting that a defendant's business will be harmed, to a certain degree, regardless of where a trial is held. Nevertheless, while interruption is inevitable regardless of where the trial is held, it is undisputable that the extent of any

potential disruption would be less if the trial took place in Florida.") (citations omitted). Savedoff's family situation merits some consideration. Every trial and major hearing imposes on all involved, and the Government easily could argue that Savedoff has imposed on his financial victims as much as the Government has imposed on him. Nonetheless, in the context of other reasons for transfer, disrupting Savedoff's family to keep the case in this District would serve no purpose.

Finally, the location of discovery usually is a negligible factor when considering transfer. Nonetheless, the Court will note that a lot of discovery in this case would have originated in the Southern District of New York, even if the Government can make it available here as well. The Court twice before set a schedule for omnibus pretrial motions [10, 32], but preliminary discovery issues sidetracked those schedules. If the Court were to set a new schedule then the schedule would include a new deadline for reciprocal discovery. Reciprocal discovery from Savedoff almost certainly would originate from the Southern District of New York. The Court also notes that one of the preliminary discovery issues currently pending—which also happens to be at the center of repeated motion practice from Savedoff—concerns a certain hard drive that the Government obtained from JaLynda Burford ("Burford"), a former employee of a mortgage bank involved in the events of the alleged conspiracy. The hard drive originated and has returned outside of this District. Burford is a probable trial witness and does not reside in this District. Numerous other trial witnesses likely reside in the Southern District of New York.

After considering all of the relevant circumstances, the Court finds that a transfer would be appropriate and in the interest of justice for Savedoff. Since the Court is recommending transfer, the Court also will recommend that Savedoff's pending motion to compel [129] be held in

13

abeyance. The Southern District of New York will be in a better position to resolve outstanding issues concerning the Burford hard drive and then to set both a new pretrial schedule and a trial date. The Government has accused Savedoff of "effectively delay[ing] filing of pretrial motions by filing two irrelevant discovery motions [concerning the Burford hard drive] on the eve of the pretrial motion due date." [172 at 16.] Without commenting on what the ultimate disposition of the pending motion should be, perhaps the Government needs to be reminded that Savedoff's "irrelevant motions" were prompted by a law enforcement agent's failure to follow a widespread, best practice with electronic discovery: *Make a forensic image immediately of any electronic devices surrendered or seized. Cf., e.g., United States v. Sharp*, No. 1:14-CR-227-TCB, 2015 WL 4644348, at *3 (N.D. Ga. Aug. 4, 2015) ("Upon receipt of the evidence taken from Sharp's apartment, Agent Orkin also asked FBI Special Agent Steven Bennett ('Agent Bennett') to make a forensic copy or image of Sharp's computer, adding that Agent Bennett should do so 'as soon as possible' since the computer was obtained based on Sharp's consent."); *id.* ("We always search an image, a forensic image, to preserve the original evidence. So we always work off the image."); Amy Baron-Evans, *When the Government Seizes and Searches Your Client's Computer*, 1 Andrews Privacy Litig. Rep. 20 (2004) ("The government can search the computer on-site and copy the files specified in the warrant at that time, or it can make a 'mirror image' of the entire hard drive, then take it off-site, restore it to another hard drive that has been wiped clean, and search for and seize the files and data specified in the warrant. The latter is the better forensic practice because searching the original hard drive can compromise the original evidence, and an image is unreadable unless it is restored to another hard drive.") (citation omitted). As noted in the most recent oral argument, the

Burford hard drive *as it was in 2013* no longer exists, because a failure to create a forensic image has changed the hard drive's metadata forever; that, in turn, has raised some questions about whether alterations to the hard drive's contents have occurred since 2013. How much the law enforcement agent's error matters remains to be seen. *See, e.g., United States v. Heiser*, 473 F. App'x 161, 166 (3d Cir. 2012) (unpublished opinion) (destruction of digital evidence requires bad faith before it rises to a due process violation). But an error it was, and pointing it out is hardly "irrelevant."

### C. *Propriety of Transfer for Rodriguez*

All of the above factors concerning Savedoff support transfer for Rodriguez as well. The Court is not ignoring that Rodriguez, like Savedoff, is accused of joining a fraud scheme that hurt victims in multiple locations. Nonetheless, the Government acknowledges in the indictment that Rodriguez is a real estate broker who works in Bronx, New York. [*See also* 172 at 3 ("Rodriguez acted as real estate agent and owned real estate and appraisal companies that were utilized to complete the fraudulent transactions charged in the indictment.").] Every parcel of real property specifically identified in the indictment and explicitly linked to Rodriguez was a parcel in Bronx, New York. Most of the trial witnesses who would testify about Rodriguez, or in his behalf, likely will come from Bronx or at least the greater New York City area. *Cf. United States v. Fiorentino*, No. CR 13-0338 SJF, 2014 WL 108415, at *7 (E.D.N.Y. Jan. 6, 2014) ("Given the government's fraud allegations, defendant's intent and his general character are germane to this case. In fact, courts have recognized, the impact of character witnesses is generally greater in the district where such witnesses live and work.") (internal quotation marks and citations omitted); *United States v. Layne*, No. 05 CR.87(HB), 2005 WL 1009765, at *3 (S.D.N.Y. May 2, 2005)

15

("[Transfer] makes good sense since the character witnesses will come from the same neighborhood as the jury."). The location of Government discovery again is only a minor factor, but any reciprocal discovery that Rodriguez eventually produces likely will come from the Southern District of New York. Like Savedoff, Rodriguez is self-employed and likely would have to shutter his business for several weeks if he had to travel to Buffalo for trial. The potential impact on Rodriguez's business dovetails with his ability to fund his own defense. The Court found Rodriguez eligible for assigned counsel under the Criminal Justice Act of 1964 ("CJA"), 18 U.S.C. § 3006A. [48.] To help with trial preparation and to reduce expenses, the Court already changed Rodriguez's assigned counsel from an attorney in Buffalo to an attorney in the Southern District of New York. [123.] *Cf. United States v. Haley*, 504 F. Supp. 1124, 1128 (E.D. Pa. 1981) (granting transfer and finding counsel a neutral issue, where CJA counsel would be available in defendants' home district). The Court already has allowed Rodriguez and Savedoff to appear by videoconference on several occasions for the same reason. Forcing Rodriguez to go to trial for several weeks in Buffalo would undermine decisions that the Court already has made in the interest of justice about Rodriguez's finances. Finally, Rodriguez has represented that he has caretaker obligations for children and an 85-year-old mother with dementia. The Government has challenged Rodriguez to substantiate the details of these obligations, but Rodriguez's representations came through his attorney, a legal officer fully admitted in this District with full ethical obligations to the Court. In the highly unlikely event that counsel has lied about something that could be checked very easily, the Southern District of New York would be more than capable of assessing appropriate consequences.

After considering all of the relevant circumstances, the Court finds that a transfer would be appropriate and in the interest of justice for Rodriguez as well. Transfer of both Savedoff and Rodriguez necessarily will entail severance from the defendants who have entered guilty pleas and who await sentencing. "Although Rule 21(b) does not expressly provide for severance, it is a necessary concomitant when a transfer does not involve all of the defendants in a case." *Aronoff*, 463 F. Supp. at 458 n.4 (citations omitted).

IV. CONCLUSION

For all of the foregoing reasons, the Court respectfully recommends granting Savedoff's and Rodriguez's motions. [135, 154 / 169.] The Court recommends further that Savedoff's pending motion to compel [129] be held in abeyance for adjudication in the Southern District of New York.

V. OBJECTIONS

A copy of this Report and Recommendation will be sent to counsel for the parties by electronic filing on the date below. Any objections to this Report and Recommendation must be electronically filed with the Clerk of the Court within 14 days. *See* 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59. "As a rule, a party's failure to object to any purported error or omission in a magistrate judge's report waives further judicial review of the point." *Cephas v. Nash*, 328 F.3d 98, 107 (2d Cir. 2003) (citations omitted).

SO ORDERED.

__/s Hugh B. Scott_____
Hon. Hugh B. Scott
United States Magistrate Judge

DATED: February 20, 2018

17